975 F.2d 218
 141 L.R.R.M. (BNA) 2549
 UNITED STATES DEPARTMENT OF JUSTICE, IMMIGRATION AND
NATURALIZATION SERVICE, Petitioner-Cross-respondent,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent-Cross-petitioner.
 No. 91-4525.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 20, 1992.
 
 William Kanter, Howard S. Scher, Appellate Staff, Civ.Div., Dept. of Justice, Washington, D.C., for petitioner.
 Richard Zorn, Atty., William R. Tobey, Dep. Sol., William E. Persina, Sol., Arthur A. Horowitz, Associate Sol., Federal Labor Relations Authority, for respondent.
 Judith D. Galat, Staff Counsel, American Federation of Government Employees, Washington, D.C., for intervenor-respondent--American Federation of Government Employees, et al.
 Petition For Review And Cross-Application For Enforcement Of An Order Of The Federal Labor Relations Authority.
 Before GOLDBERG, JONES, and DeMOSS, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 This case concerns the duty of the Immigration and Naturalization Service ("agency" or "INS") to negotiate with its employees' collective bargaining representative, the National Border Patrol Council and the National Immigration and Naturalization Service Council of the American Federation of Government Employees AFL-CIO (hereinafter collectively referred to as "union"), over a union proposal requesting that employees be given up to 48 hours to consult with a union representative before the agency can question employees about shooting incidents.
 
 FACTS AND THE FLRA's ORDER
 
 2
 The dispute between the INS and its employees' union arose when the INS revised its policy regarding agency investigations of shooting incidents involving INS employees. The new INS policy provides in relevant part:
 
 
 3
 Employees who discharge a firearm, or are involved in a shooting incident, shall be required to provide a written report of the incident within sixteen (16) hours of the incident. Any other employee who observes a shooting incident, but does not discharge a firearm or is not directly involved in a shooting incident, shall be required to provide a written report of the incident before the termination of the shift.[1]
 
 
 4
 In response to the agency's new policy, the union submitted six proposals for negotiation. Relevant to this appeal is Proposal 5 which reads:
 
 
 5
 Employees directly or indirectly involved in a reportable shooting incident or firearms discharge will be afforded the opportunity to consult with a union representative prior to being required to provide a written report or oral statement, other than the initial verbal notification. Absent unusual circumstances, such consultation shall not delay the report or statement for more than forty eight (48) hours, consistent with the appropriate Collective Bargaining Agreement Provisions.[2]
 
 
 6
 The INS refused to negotiate over the union's proposals, claiming that under the Management rights provision of the Federal Service Labor Management Relations Act, 5 U.S.C. § 7106, the union's proposals were nonnegotiable. The union petitioned the Federal Labor Relations Authority[3] ("FLRA" or "Authority") to review the INS's allegations of nonnegotiability pursuant to 5 U.S.C. § 7117(c).[4] In accordance with its statutory mandate to resolve "issues relating to the duty to bargain in good faith," § 7105(a)(2)(E), the FLRA reviewed the union's proposals and found that Proposals 1, 2, 3, 4 and 6 were nonnegotiable. However, the Authority determined that Proposal 5 was within the agency's obligation to negotiate and ordered the INS to bargain with the union.
 
 
 7
 On appeal, the INS seeks review of the FLRA's order. The INS contends that Proposal 5 is not negotiable under § 7106 because the proposal interferes with the reserved management rights to determine internal security practices and to assign work, §§ 7106(a)(1) and (a)(2)(B). The FLRA requests enforcement of its order, maintaining that Proposal 5 is negotiable both as a "procedure," § 7106(b)(2), and an "appropriate arrangement," § 7106(b)(3). We have jurisdiction under to §§ 7123(a) and (b).[5]
 
 STATUTORY BACKGROUND
 
 8
 The Federal Service Labor Management Relations Act, 5 U.S.C. §§ 7101-7135 (the "Act"), governs labor relations between federal agencies and their employees. The Act reflects Congress' attempt to strike a balance between the needs of government agencies and the legitimate demands of public employees. While recognizing that "statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations ... safeguards the public interest," § 7101(a)(1)(A), the Act also insists that its provisions be "interpreted in a manner consistent with the requirement of an effective and efficient Government." § 7101(b).[6]
 
 
 9
 The Act grants federal employees the right to "engage in collective bargaining with respect to conditions of employment," § 7102(2), and obliges federal agencies and labor organizations to negotiate in good faith, §§ 7116(a)(5) and (b)(5). However, the duty to negotiate is limited by "a number of provisions designed to reconcile collective bargaining with the distinctive needs of government employment." AFGE, AFL-CIO, Local 2782 v. FLRA, 702 F.2d 1183, 1185 (D.C.Cir.1983). Relevant to this case is the "Management rights" provision, § 7106, which removes certain managerial decisions from the bargaining table. Section 7106 provides:
 
 
 10
 (a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency--
 
 
 11
 (1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency; and
 
 
 12
 (2) in accordance with applicable laws--
 
 
 13
 (A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;
 
 
 14
 (B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;
 
 
 15
 (C) with respect to filling positions, to make selections for appointments from--
 
 
 16
 (i) among properly ranked and certified candidates for promotion; or
 
 
 17
 (ii) any other appropriate source; and
 
 
 18
 (D) to take whatever actions may be necessary to carry out the agency mission during emergencies.
 
 
 19
 (b) Nothing in this section shall preclude any agency and any labor organization from negotiating--
 
 
 20
 (1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;
 
 
 21
 (2) procedures which management officials of the agency will observe in exercising any authority under this section; or
 
 
 22
 (3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.
 
 
 23
 While subsection (a) of § 7106 exempts from the duty to bargain certain management rights which Congress deemed essential to the effective conduct of agency business, the exemption is "subject to some expressly limited exceptions carved out of these broad rights in subsection (b)." United States Dept. of Justice v. FLRA, 727 F.2d 481, 487 (5th Cir.1984). Whether the provisions of § 7106(b)(2) and (b)(3) apply to Proposal 5 is the central question before us.
 
 ANALYSIS
 
 24
 The FLRA ordered the INS to negotiate with the union over Proposal 5. The Authority found that Proposal 5 is negotiable as a "procedure" under § 7106(b)(2) and as an "appropriate arrangement" under § 7106(b)(3). Because the FLRA's application of §§ 7106(b)(2) and (b)(3) to Proposal 5 is inconsistent with statutory mandate, congressional policy and prior FLRA decisions, we reverse the FLRA's order.
 
 STANDARD OF REVIEW
 
 25
 Courts reviewing FLRA orders are instructed to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 7123(c) and 706(2)(A). See United States Dept. of Justice, INS v. FLRA, 955 F.2d 998, 1001 (5th Cir.1992) ("The FLRA's legal construction of the statute is entitled to deference if it is reasoned and supportable"). The Supreme Court has emphasized that reviewing courts must ordinarily defer to FLRA decisions:
 
 
 26
 The FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act. (citation omitted) Consequently, the Authority is entitled to considerable deference when it exercises its special function of applying the general provision of the Act to the complexities of federal labor relations. Bureau of Alcohol, Tobacco & Firearms v. FLRA 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983).
 
 
 27
 Though the deference owed to FLRA decisions is substantial, the Court has emphatically warned that this deference "cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." Id. The Court elaborated:
 
 
 28
 while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act, (citation omitted) they must not rubber stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Id.
 
 
 29
 Keeping this standard in mind, we now review the FLRA's application of §§ 7106(b)(2) and (b)(3) to Proposal 5.
 
 THE § 7106(B)(2) EXCEPTION
 
 30
 Section 7106(b)(2) provides that the reserved Management rights set forth in subsection (a) of § 7106 shall not preclude negotiation over "procedures which management officials of the agency will observe in exercising any authority under this section." In determining whether a given proposal is negotiable as a "procedure" under § 7106(b)(2), the FLRA applies the "direct interference" test. "[T]he decision maker must ask whether 'implementation [of a proposal] would "directly interfere with the agency's basic rights" ' listed in § 7106(a). (citation omitted) If implementation of the proposal would not interfere directly with managerial prerogatives, it is procedural and therefore negotiable." AFGE AFL-CIO, Local 1923 v. FLRA, 819 F.2d 306, 308 (D.C.Cir.1987).
 
 
 31
 Applying the "direct interference" test to Proposal 5, the FLRA had to determine whether the union's demand for up to 48 hours to consult with a union representative directly interferes with the INS's protected right to determine its internal security practices and to assign work. The FLRA found that the proposal "does not directly interfere with the Agency's rights under section 7106 of the statute." AFGE National Border Patrol Council and National INS Service Council and United States Dept. of Justice, INS 40 FLRA No. 51, 29 (1991). The FLRA explained the basis of its decision:
 
 
 32
 the Agency has not demonstrated, and it is not otherwise apparent to us, that the proposal would preclude the Agency from disciplining employees (for the underlying conduct or for failure to cooperate in the investigation), or for requiring employees to cooperate in such an investigation, including the requirement that employees respond to Agency inquiries. Moreover, the agency has not asserted or demonstrated that, in view of the Union's interpretation of the proposal, the proposal would directly interfere with the rights to determine its internal security practices or to take action in an emergency. Id. at 32.
 
 
 33
 Although we must defer to the Authority's reasonable conclusions, we cannot rubber stamp decisions which frustrate the "congressional policy underlying the statute." Bureau of Alcohol, Tobacco & Firearms v. FLRA 464 U.S. at 97, 104 S.Ct. at 444. The Management rights provision, § 7106(a)(1), reflects Congress' determination that the internal security practices of federal agencies are not negotiable. Because Proposal 5 clearly interferes with the INS's internal security practices, upholding the FLRA's order would frustrate congressional policy.
 
 
 34
 The INS has determined that its internal security requires obtaining a written report from employees involved in shooting incidents within 16 hours of the shooting. As INS personnel carry firearms along our national borders and at ports of entry, shooting incidents, which often involve foreign nationals, generate an urgent need for complete information. These incidents are politically and diplomatically sensitive. Furthermore, because the INS engages in undercover operations, shooting incidents could compromise the safety of other INS employees.
 
 
 35
 Proposal 5 requires the INS to halt its investigation for up to 48 hours to allow an employee to consult with a union representative. The length of the delay is completely within the control of the employee and the union. The delay of the INS's investigation, until after a union representative arrives for consultation with employees, obstructs the INS's internal investigation in several ways. The longer the investigators must wait to question suspects and witnesses, the more likely it is that memories will fade and physical evidence that could be found on the basis of the information from the witnesses would disappear.
 
 
 36
 Moreover, the INS understandably fears that the 48 hour consultation period will facilitate collusion between suspects and witnesses, coordination of alibis and tailored answers. A similar concern motivated the D.C. Circuit Court in Dept. of the Treasury, IRS v. FLRA 707 F.2d 574 (D.C.Cir.1983) to remand an FLRA order. In Dept. of the Treasury, a union proposal demanded that during agency interrogations an employee be permitted to "avoid immediate response to a question upon determining for himself or herself that the question lacks relevance or materiality," and the "employee [be] allowed to furnish a written response at an unspecified later date." Id. at 580. The court expressed its concern that as a result of the union's proposal, "[t]he spontaneous, concentrated, face-to-face interview contemplated by the IRS could be displaced in part by a written exchange, with delayed, tailored answers which could not be followed up by on-the-spot probing." Id. Proposal 5 raises similar concerns over "tailored answers" which would be facilitated by the proposed 48 hour consultation period.
 
 
 37
 The normal deference owed to the FLRA's decision is further undercut in the instant case by the FLRA order's inconsistency with prior FLRA "direct interference" determinations. See Federal Employees Metal Trades Council, AFL-CIO, v. FLRA, 778 F.2d 1429, 1431 (9th Cir.1985) ("Arbitrary differences in the treatment of similar cases undercut the agency's claim to deference"). In AFGE, Local 1808 and United States Dept. of Army, Sierra Army Depot, 37 FLRA 1439 (1990), a union proposal required that employees be notified two hours before the agency conducts employee drug tests. The FLRA held that the union proposal "directly interferes with management rights," and is thus nonnegotiable, because unannounced tests "make it difficult for drug users to take action to cover up their use or otherwise evade the test." Id. Proposal 5, like the proposal the FLRA found nonnegotiable in Local 1808, would make it easier for employees to cover up their actions or otherwise evade the investigation. See also National Federation of Federal Employees, Local 1300 and General Services Administration, 18 FLRA 789 (1985) (FLRA held that a union proposal, requiring an agency to notify employees before the agency contacted their friends or family in the course of internal investigation, directly interfered with the agency's rights under § 7106(a) because the proposal "mandated a particular internal security practice").
 
 
 38
 Proposal 5 also directly interferes with the INS's ability to assign work, a nonnegotiable management right under § 7106(a)(2). "[I]mposing and enforcing a duty to account, whether generally or in disciplinary investigations, lies within the scope of the powers to assign work." Navy Public Works Center v. FLRA, 678 F.2d 97, 101 (9th Cir.1982). This Circuit has held that the management's decision of when a work assignment is to be done is one of the protected management rights under § 7106(a). See United States, INS, v. FLRA, 834 F.2d 515, 517 (5th Cir.1987) ("There is neither an obligation nor a duty to negotiate with the union as to WHEN an employee is assigned to do a particular task"); United States Dept. of Justice, INS, v. FLRA, 727 F.2d 481, 488 (5th Cir.1984) ("[t]he right to assign work necessarily encompasses the right to determine when it will be performed"). See also United States Customs Service v. FLRA, 854 F.2d 1414, 1419 (D.C.Cir.1988) ("[w]ithout a doubt, the right to determine what work will be done, and by whom and when it is to be done, is at the very core of successful management of the employer's business"). Because Proposal 5 directly interferes with the agency's decision regarding when its employees must answer questions, the proposal directly interferes with the agency's reserved right to assign work.
 
 
 39
 In sum, Proposal 5 would delay and obstruct the agency's conduct of internal investigations and thus directly interfere with the agency's reserved rights to determine its internal security practices and to assign work. We therefore hold that Proposal 5 is not a negotiable procedure under § 7106(b)(2).
 
 THE § 7106(B)(3) EXCEPTION
 
 40
 Section 7106(b)(3) provides that the reserved Management rights set forth in subsection (a) of § 7106 shall not preclude negotiation over "appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials."
 
 
 41
 To determine whether a union proposal is an "appropriate arrangement" under § 7106(b)(3), the FLRA applies the "excessive interference" test. Under this test, the FLRA first determines whether "the proposal constitutes an arrangement" for adversely affected employees. AFGE National Border Patrol Council and National INS Service Council and United States Dept. of Justice, INS 40 FLRA No. 51, at 6. If the proposal is an arrangement for adversely affected employees, the FLRA next determines its appropriateness by whether "it excessively interferes with a management right under § 7106 of the statute." Id. This determination involves weighing the competing practical needs of employees on the one hand and managers on the other hand, so as to determine whether the impact of the proposal on management's rights is excessive when compared to the benefits afforded employees.
 
 
 42
 The FLRA's excessive interference test has been adopted by several circuits. See e.g., AFGE Local 1923 v. FLRA, 819 F.2d 306, 308 (D.C.Cir.1987) ("the decision maker must ask whether implementation of the proposed arrangement would impinge upon management prerogatives to an excessive degree"); OEA, Inc. v. FLRA, 961 F.2d 36, 38 (2nd Cir.1992) ("[t]he FLRA's excessive interference standard properly adds flesh to the term 'appropriate' by employing a test that balances the competing needs of employees and managers"); Horner v. Bell 825 F.2d 382, 389 (Fed.Cir.1987) ("the critical inquiry is whether the provision interferes with management prerogative to 'an excessive degree' ").
 
 
 43
 Before reviewing the FLRA's application of the excessive interference test to Proposal 5, we pause to consider the INS's broad challenge to the legitimacy of the "excessive interference" test. The INS argues that if a proposal interferes at all, never mind excessively, with the exercise of a reserved management right, it cannot be an appropriate arrangement under § 7106(b)(3). According to the INS, a proposal is an "arrangement" only if it "mitigates" or "ameliorates" the adverse effects of management's action after that action has been taken. The INS argues:
 
 
 44
 [T]he 'appropriate arrangements' clause cannot be used to interfere with or limit the exercise of a management right in the first instance. A proposal which calls for management to refrain from exercising a right seeks to address more than the adverse effect(s) of such exercise; instead, it seeks to address the substance of the management right in the first instance. That is plainly not what the 'appropriate arrangements' permits because employees cannot be viewed as 'adversely affected by the exercise of [management rights]' if the very exercise of the right would be prevented by the proposal in the first instance.[7]
 
 
 45
 Although the INS's interpretation of § 7106(b)(3) is plausible, its argument has been repeatedly rejected by the FLRA and the several Circuits who have adopted the "excessive interference" test. The INS's interpretation of § 7106(b)(3) was first confronted and rejected in AFGE, AFL-CIO Local 2782 v. FLRA 702 F.2d 1183 (D.C.Cir.1983). The D.C.Circuit held that an arrangement proposed under subsection (b)(3) of § 7106 is not invalid simply because it conflicts with one of the reserved rights in subsection (a) of § 7106. The court concluded that this construction "is evident from the prologue of subsection (b), which states that "[n]othing in this section shall preclude any agency and any labor organization from negotiating" over the specified items. The prologue of subsection (a) makes the same point, declaring that all the management prerogatives it contains ... are "subject to subsection (b) of this section."[8] Id. at 1185. See also United States Dept. of Interior Minerals Management Service v. FLRA, AFGE, AFL-CIO Local 3457, 969 F.2d 1158, 1163 (D.C.Cir.1992) (affirming the rejection of the same argument). Following the D.C.Circuit, and keeping in mind the deference due the Authority when it interprets the statute which it administers, we find the FLRA's interpretation of § 7106(b)(3) to be reasonable and thus we adopt the "excessive interference" test.
 
 
 46
 Applying the "excessive interference" test to Proposal 5, the FLRA concluded that the proposal is negotiable because it does not excessively interfere with reserved management rights. The Authority explained: "[T]he benefits to employees, which in our view includes the facilitation of consultation with the employees' recognized bargaining representative as well as the ability to use a minimal amount of time to do so, strongly and clearly outweigh such minimal effects on the Agency's rights." AFGE National Border Patrol Council and National INS Service Council and United States Dept. of Justice, INS 40 FLRA No. 51, at 32.
 
 
 47
 The FLRA's finding of negotiability under § 7106(b)(3) must be reversed because the Authority's analysis does not give proper effect to Congress' explicit intent that § 7106(b)(3) arrangements be negotiable only if such arrangements are aimed at employees who are "adversely affected." The deference normally owed to the analysis of the FLRA is not warranted if the FLRA's decision is one that is inconsistent with Congress' statutory mandate. See Chevron U.S.A., Inc. v. Natural Res. Def. Council 467 U.S. 837, 842-843, 104 S.Ct. 2778, 2781-2782, 81 L.Ed.2d 694 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent").
 
 
 48
 Proposal 5 is not tailored to benefit only those employees who would be adversely affected by the INS's questioning. The language of Proposal 5 unambiguously covers employees who are not directly involved in shooting incidents.[9] Furthermore, the Authority recognized that the "right to Union representation encompassed by the proposal would not depend on an affected employee's belief that he or she was subject to discipline." AFGE National Border Patrol Council and National INS Service Council and United States Dept. of Justice, INS 40 FLRA No. 51, at 29. The FLRA argues that since the results of the agency's investigations "may provide a basis upon which an employee is disciplined[,] it is reasonably foreseeable that some bargaining unit employee can expect to be disciplined or otherwise adversely affected by the results of the management's decision to investigate."[10] While we do not deny that some employees might expect to be disciplined or be otherwise adversely affected by the results of the management's investigation, Proposal 5 makes no attempt to specifically protect those employees. The proposal simply covers all employees who are subject to the agency's investigation.[11]
 
 
 49
 The recent decision in United States Dept. of Interior Minerals Management Service v. FLRA, AFGE, AFL-CIO Local 3457, 969 F.2d 1158 (D.C.Cir.1992), is on point. In response to an agency drug testing program, a union proposed "allowing employee challenges to any action stemming from implementation of an agency drug program, or any agency personnel action regardless of whether any challenging employee was adversely affected by such action." Id. at 1162. The Local 3457 court reversed the FLRA's negotiability ruling as contrary to law. The court explained: "Unlike the Authority, we read § 7106(b)(3) as unambiguously applying only where the FLRA has identified the reasonably foreseeable adverse effects that will flow from some management action; and only when the proposed arrangement is tailored to benefit or compensate those employees suffering those adverse effects." Id. The court reversed the Authority's order because the Authority did not "consider whether the balm provided by the proposal would be administered only to hurts arising from the program, and to employees suffering such harm." Id. Proposal 5 suffers from the same fatal disease that killed the union proposal in Local 3457.
 
 
 50
 Because Proposal 5 is not negotiable as an arrangement for adversely affected employees, we need not address the second prong of the excessive interference test regarding whether the proposal excessively interferes with the management's reserved rights.[12]
 
 CONCLUSION
 
 51
 For the reasons set forth above, we hold that Proposal 5 is not negotiable and reverse the FLRA's order. REVERSED.
 
 
 
 [1]
 INS's firearms policy is sets forth in Chapter 4210 of its Administrative Manual
 
 
 [2]
 Confusion arose during oral argument regarding whether the parties' collective bargaining agreement contained a provision analogous to Proposal 5 prior to the institution of the INS's revised policy. The parties' supplemental memoranda clarify that although prior contractual provisions allowed an employee 48 hours to obtain a union representative to be present at INS investigations, no prior agreement provided that an employee be given 48 hours to consult with a union representative before an investigation
 As the old agreement merely provided for union representation at agency interrogations of employees, it was largely overlapped by the statutorily provided "Weingarten" provision, 5 U.S.C. §§ 7114(a)(2)(B)(i) and (ii), which provides that "[a]n exclusive representative of an appropriate unit in an agency shall be given the opportunity to be represented at--any examination of an employee in the unit by a representative of the agency in connection with an investigation if--the employee reasonably believes that the examination may result in disciplinary action against the employee and the employee requests representation."
 
 
 [3]
 The FLRA, a three-member bi-partisan body created by the Act, § 7104, is charged with providing "leadership in establishing policies and guidance relating to matters under this chapter." § 7105(a)(1)
 
 
 [4]
 Section 7117(c) provides in relevant part that "if an agency involved in collective bargaining with an exclusive representative alleges that the duty to bargain in good faith does not extend to any matter, the exclusive representative may appeal the allegation to the Authority."
 
 
 [5]
 The agency appeals pursuant to § 7123(a) which provides that "any person aggrieved by any final order of the Authority ... [may] institute an action for judicial review of the Authority's order in the United States court of appeals ..." The FLRA seeks enforcement under § 7123(b) which provides that "[t]he Authority may petition any appropriate United States court of appeals for the enforcement of any order of the Authority ..."
 
 
 [6]
 By instructing courts to interpret the provisions of the Act in a "manner consistent with the requirement of an effective and efficient government," Congress sought to remind courts that the provisions of the Act should not be interpreted in the same manner as the provisions of the Act's private sector analogue, the National Labor Relations Act. When applying the Act to public sector labor disputes, courts must be mindful of the unique responsibilities of government agencies and their important role in promoting the public interest
 
 
 [7]
 Petitioner's Brief at 29
 
 
 [8]
 The INS attempts to discredit the D.C. Circuit's opinion by claiming that the court mistakenly relied on post-enactment legislative history which according to the INS is not legislative history at all. Without addressing the value of post-enactment legislative statements, we reject the INS's argument because the D.C. court did not base its holding on legislative history but rather on its own interpretation of the statute. AFGE, AFL-CIO Local 2782 v. FLRA 702 F.2d 1183, 1185 (D.C.Cir.1983)
 
 
 [9]
 Proposal 5 states: "Employees directly or indirectly involved in a reportable shooting incident or firearms discharge will be afforded the opportunity to consult with a union representative ..."
 
 
 [10]
 Respondent's brief at 42
 
 
 [11]
 The "Weingarten" provision, § 7114(a)(2)(B)(i) provides a good illustration of how an appropriate arrangement may be tailored. The section gives an employee the right to union representation if "the employee reasonably believes that the examination may result in disciplinary action against the employee."
 
 
 [12]
 The INS also argues that Proposal 5 is nonnegotiable because it covers investigations conducted by the FBI, U.S. Attorney's Office, and the Criminal Section of the Civil Rights Division. We reject this argument as we find nothing in Proposal 5, nor elsewhere in the record, indicating that Proposal 5 is intended to apply to any agency beside the INS